REGAN, Judge.
Plaintiff, Argonaut-Southwest Insurance Company, as subrogee of its insured, Comet Drilling Company, filed this suit to recover the sum of $170,000, representing property damage to a drilling rig which caught fire when an oil well blew-out. Named defendants were General American Oil Company of Texas, owner of the well for whom Comet had been drilling when the rig caught fire and its liability insurer, the Travelers Insurance Company.[1]
Plaintiff alleged that the blow-out was caused by the negligence of the owner, who, after failing to use available data on geological structures in the drilling area, required the plaintiff to use a mud weight in drilling that was insufficient to contain the well. Under the contract between the owner and the driller, the owner had reserved to itself the right to specify what mud program would be followed in the drilling operation.
The defendants answered and denied negligence, asserting that the sole cause of the blow-out was the unsafe drilling procedures used by the Comet crew. As alternative defenses, they pleaded contributory negligence and assumption of risk. In addition, they explained that the contract between the owner and the driller contained an agreement by Comet to hold the owner harmless or release it from liability in the event the rig was damaged during the drilling operations.
The trial judge referred this matter to the Commissioner of the Civil District Court for the Parish of Orleans for trial. After conducting a lengthy hearing, the Commissioner filed a report with the district judge containing findings of fact and conclusions of law. To summarize briefly, he concluded that the negligence of the Comet crew was the sole and proximate cause of the blow-out. He recommended that plaintiff’s suit be dismissed against all defendants. The trial judge, without comment, rendered judgment in accordance with the Commissioner’s recommendations. From that judgment, plaintiff has appealed.
The record discloses that on January 3, 1967 General American, as owner of a mineral lease in the Bosco Field near Lafayette, Louisiana, entered into an agreement with Comet Drilling Company for the drilling of a well to a depth of 10,000 feet. The provisions of the agreement pertinent to the dispute before us are:
(1) The owner reserved to itself the right to furnish all chemicals and drill *739 ing mud used in the operation. Further the owner had the right “ * * * at all times to specify the quality, type and condition of the mud, the weighing conditions used and the water content hereof, and CONTRACTOR shall act in accordance with OWNER’S specifications.”
(2) The driller was an independent contractor “ * * * with authority to control and direct the performance of the details of the work, OWNER being interested only in the results obtained.

(3) In the same clause specifying the driller was an independent contractor the following sentence appears: “OWNER shall not be liable for and CONTRACTOR shall indemnify and hold OWNER harmless from and against any damage, loss of injury to persons or property, including CONTRACTOR’S property, that may arise from CONTRACTOR’S operations under this agreement.”
Plaintiff has based its charge of negligence on the owner’s reservation of the right to specify the mud weight in the first provision enumerated hereinabove. It is claimed the well blew out because the mud weight was too light. At this point in our opinion it would be useful to enumerate several principles which all the experts have agreed upon.
Mud weight is one of the two major factors controlling well pressure while the well is being drilled. It may be defined as the measure of the hydrostatic head or back pressure that is held against the formation. The proper mud weight for each particular drilling program is not susceptible of precise calculation and the engineers who formulate the mud programs rely on data developed in drilling wells successfully in the same area as the one for which the program is being prepared. In so doing, the engineer with the premise that similar geological formations are present works within a given area. While this is a reasonable hypothesis, according to the experts, it does not always prove to be true.
If the drilling mud used is too light, the well will blow out. But, conversely, if it is too heavy, it is possible to lose circulation and/or to incur considerably more expense in drilling. Thus it would not be considered a good engineering practice to obviate the danger of a blow-out from light weight mud by indiscriminately increasing the weight. Ideally, the mud weight should be heavy enough to contain the well during all phases of the drilling operation, but, at the same time, light enough to permit drilling safely at the lowest possible cost. It is apparent that there is an element of trial and error in determining the correct mud weight, particularly in South Louisiana where blow-outs are not unusual.
In addition to mud weight, the other major factor in controlling well pressure is equipment on the rig itself, i. e., the blowout preventers. These come into play once the crew becomes aware that the well is attempting to blow. If there is time available after the first sign of a blow-out appears, the preventers can shut off the well.
In view of the foregoing elucidation we may now turn our attention to the events which led to the destruction of Comet’s No. 2 Rig.
Drilling operations began on January 4, 1967, on the well designated as the Rene Thibodeaux No. 1. Comet used a National 75 T Rotary Drilling Rig, which had a 133 foot mast, an automatic inside blow-out preventer with blind rams, a 10 inch blowout preventer with 4% inch pipe rams, on automatic pump accumulator unit, a choke manifold with valves and chokes, mud scales, viscosity measuring equipment, mud pump pressure gauges, remote controls for its pumps and a float marker to gauge the take-down of mud in the three tanks.
Comet initially drove a conductor pipe with a 14 inch diameter to a depth of 84 feet. Next a cement casing with a 9% inch diameter was set to a depth of 1906 *740 feet. The bit of the drill moving-through this case was 8% inches. Between the bit and the drill pipe were three stands of drill collars approximately 275 feet high and 7 inches in diameter. The drill pipe itself was 4% inches in diameter. Each stand of drill pipe is estimated to be between 90 and 93 feet long.
On January 6, 1967 at 8:00 a.m., drilling had progressed to a depth of 2003 feet. Because of an unanticipated lens of gas at that depth, the well “kicked” or attempted to blow out. Isom Fontenot, Comet’s der-rickman, testified the crew had just finishing connecting another stand to the drill pipe when heard a roar, the first indication of the impending kick. He then saw a bushing weighing 200 pounds blow out of the rotary followed by a geyser of mud that rose 85 feet into the air. Fontenot then ran down stairs and hit the switch to close the Hydrill, a blow-out preventer device that turned off the annulus of the well from the atmosphere. Since the kelly at the time had been connected to the drill pipe, closing the Hydrill effectively contained, but did not kill the well. After the blowout, the surface pressure at the annulus was gauged at 925 pounds per square inch and at the drill pipe, 299 per square inch.
For the next five hours, representatives of the owner, the contractor and the mud supplied conferred on what weight of mud must be pumped in to kill the well. At the time of the kick, a 9.1 pound per gallon weight was being used. After this discussion, it was decided to turn on the mud pumps to circulate the well around the choke to build up the mud weight. While this operation was in progress, Cecil Rogers, the mud supplier’s president, arrived at the scene. At his suggestion the mud pumps were turned off and the well became static. The blow-out preventers were opened and the well was circulated without fluid going over the choke. At this point it was determined that a 10.5 pound per gallon mud had brought the well under control. Circulation continued for an hour with the Hydrill open, and after replacing the swab and liner in one of the pumps, drilling resumed with a 10.2 pound mud. In IY2 hours, an additional 325 feet had been drilled.
Then Earl Marquardt, the owner’s superintendent ordered the mud weight cut to 9.-8 pounds per gallon. Comet requested and received permission from Marquardt to maintain the weight at 10.2 pounds per gallon until a Toteo survey was made and the drill bit changed. (A Toteo survey, named for the instrument used, is a means of measuring whether the hole being drilled deviates from a vertical line.) Changing the bit involves pulling all the drill pipe and collars out of the hole. In any drilling operation, this phase of removing the drill or tripping is the most critical insofar as maintaining a sufficient mud column to contain the formation pressure.
Thus, on January 6, the driller tripped out using a 10.2 mud weight without incident. The witnesses explained that while tripping out mud is pumped into the hole at regular intervals as the pipe is being pulled. Usually ten stands are pulled before the pump is turned on and then the hole is filled. By noting the overflow at the flow line on the surface, the crew can determine when the hole is filled. Because of the kick earlier that day, the crew took added precautions in tripping. After every stand of pipe was pulled (or 90 to 93 feet of pipe), the mud pump was turned on until the hole was filled.
As a further precaution, the pump strokes on each fill-up were counted. In filling approximately equal spaces each time, the number of strokes should be the same. If excess mud was being pumped in after pulling a particular stand, this could be determined if a greater number of strokes were counted to complete the fill-up. Thus, when the number of pump strokes vary to a significant degree, the driller is warned of potential problems.
Another method of measuring mud used in a fill-up is to measure the drop in the *741 level of the mud tanks after the mud pump is turned off. The drop should be approximately the same after each fill-up.
Nothing unusual was noted on the trip out. Drilling resumed until 10:00 p.m., when it was discontinued for one-half hour while a pipe was being welded. Then drilling resumed.
Thus, after the well was killed with 10.5 mud on January 6, drilling was successfully carried out with a lighter mud. At one point the weight of mud being pumped in was 9.8, and after being circulated, it returned through the flow line at 9.6. Usually the mud coming out is heavier than that being pumped in. The decrease indicated it had been gas cut. Or, to put it another way, the mud weight was nearing a point where it would exert less pressure than did the formation. After this it was increased to a minimum of 10 pounds per gallon. The request to decrease the mud weight came from Comet’s toolpusher, the man in charge of the drilling operation. His reason was that the additional mud weight slowed down the drilling operation.
It should be pointed out that the formation pressure could not be calculated. The experts agreed that without knowing the specific gravity of the gas or other fluids in the hole, it is impossible to determine bottom hole pressure.
On January 7, 1967 between 7:00 a.m., and 3:00 p.m., the well was drilled from 3410 feet to 4371 feet using 9.9 per gallon mud going in which was returned through the flow line at 10.3 pounds per gallon. During this tour the well was open 30 times when connections were made and it was still under control. On the evening tour that began at 3:00 p.m., the mud weight was increased to 10 pounds per gallon going in and 10.1 coming out. These were the weights recorded at 7:00 p.m., when the last reading before the blow-out was taken.
At 7:30 p.m., the crew began to trip out to change the bit. The bottom hole was at a depth of 4837 feet. Comet was working with a four man crew and the toolpusher was not present (nor did he testify at the trial). The trip out had been in progress for one hour and fifty minutes. Forty-seven stands of drill pipe had been pulled, leaving one stand of drill pipe and the collars still in the hole.
At this point the well blew out and the Comet crew failed to activate the blow-out preventers in sufficient time to close it off. The crew consisted of Bobby Joe Chauvin, the driller, who was in charge of the operation when the well blew; Lee Herman Fontenot, the derrickman; Cody Griffith, the motorman; and Darnel Fontenot, the “lead tong man”.
Lee Fontenot testified that during the trip out he was responsible for unlatching the pipe in the derrick and storing it on a rack. He was also required to check the mud weight every 15 minutes to make sure a 10 pound per gallon mud weight was maintained. He was supposed to record the mud weight every hour. During the trip out or between 7:30 and approximately 9:30 p.m., he did not check the mud weight. His testimony on this point is as follows:
“Q. The drilling report shows that pulling out of a hole from about 7:30 p.m. to 9:20 p.m., almost two hours, is that how long it takes to pull out of a hole?
* * * * * *
“Q. You didn’t check the mud weight during that time?
“A. No sir.
“Q. Nobody did as far as you know?
“A. No.
“Q. It wasn’t anybody elses job other than yours to check the mud weight?
“A. That’s right.”
Lee Fontenot explained that during the trip out it was the driller’s job to fill the *742 mud hole. While this was being done, the crew on duty did not count the pump strokes to determine whether the well was taking an excessive quantity of mud.
Cody Griffith the motorman was working on the rig floor at the time of the blow-out. It was his duty during the trip out to see that the hole was filled. The mud pumped in is stored in three interconnected tanks. Griffith testified he measured the volume of mud pumped into the hole by tying a nut on a string and dropping it exactly to the mud level before the pump was turned on. Once the hole was filled he would then measure the drop in the mud level by approximating the distance between the dangling nut and the lowered mud surface. It was his claim that the mud level dropped a total of six or seven inches in the tanks during the entire trip out or until the blow-out occurred. Yet he testified that the mud level dropped one inch on each fill-up.
This testimony is contradictory. According to the uncontroverted evidence 47 stands of pipe had been pulled from the hole before the blow-out. If the crew had been filling the hole after every four stands, and if each fill-up dropped the level of mud one inch, the total loss from the mud tanks would have been a minimum of 11 inches of mud. Griffith was aware that counting pump strokes was a reliable way to determine the amount of mud taken by the hole on each fill-up. He knew how to count strokes but testified he was not instructed to do so by the driller. He also indicated this was not often required of him in his experience on the rigs over the years.
The other crew member, Darnel Fon-tenot, testified he was responsible for watching the flow line on the trip out. While 47 stands were being pulled he saw nothing to indicate the well was going to blow. Then he first saw mud bubbling out of the drill pipe shooting about three to five feet high. Then Chauvin shouted to him to get the hook. He admitted that if the crew at that point had been instructed to- get the safety valve, it is possible the blowout could have been prevented. While we attach no great weight to this statement, it is a factor to be taken into consideration.
It is apparent that this crew had not been trained in blowout prevention, although there is a school available that teaches the course.
From the evidence summarized, the Commissioner concluded the well blew out as a result of Comet’s negligence. He further found that the 10 pound per gallon mud weight specified by the owner had been proven to be adequate by the fact that all phases of the drilling operation had been successfully performed by using a mud weight of ten pounds per gallon or less.
On appeal, plaintiff has argued that, in reaching this conclusion, the Commissioner ignored the evidence concerning what would have been a safe mud weight under the circumstances. It is contended that once the owner was apprised of potential danger by the kick on January 6 it should have allowed for a sufficient overbalance in the mud used to assure safe drilling. After Rene Thibodeaux Well No. 1 blew out and produced gas for a short time, a replacement well was drilled some 200 feet away. It was successfully drilled with a 10.5 pound per gallon mud weight.
As we read the expert testimony as to what would have been a proper mud weight that would have included a safe overbalance, we are constrained to remark that it is highly speculative. Again, we reiterate that a mud weight program is not susceptible of precise calculation.
Paul Montegomery, a petroleum engineer, called by the plaintiff, testified that the well blew out because the mud weight was insufficient. It was his opinion that a 10.8 mud weight should have been specified after the owner was warned of unusual pressures in this well by the first kick.
*743 When the mud weight in the drilling column exactly equals the bottom pressure in the formation the well should be contained. However, it is a good engineering practice to provide an overbalance in the mud column by using a mud that will exert a slightly greater pressure than that of the formation. Many of the owner’s experts were reluctant to assign a specific weight that should be figured in the mud program as a safety factor. Cecil Rogers, the mud supplier’s president, did say that .5 pounds per gallon is what he considered to be an adequate overbalance.
It will be recalled that at one point after the kick, indications of potential trouble manifested themselves when a 9.8 mud was used going in that returned at 9.6. This was the gas cut mud previously referred to. It is questionable whether the 9.8 mud in would continue to assert sufficient hydrostatic pressure to contain the well. The last recorded weight was 10 pounds per gallon mud in and 10.1 out. We do not believe that this mud program carried sufficient weight to allow for a .5 overbalance. While there is some evidence of negligence on the part of the owner, we do not conclude that it was improperly absolved of liability by the Commissioner and the Trial Court.
The evidence convicts the Comet crew of various acts of negligence which, if not the sole proximate cause of the accident, are at least contributing proximate causes. We first observe that the mud weight at the time of the blow-out was unknown. Although Lee Fontenot was assigned to check the weight every fifteen minutes and record the weight every hour to be sure a 10 pound per gallon weight was being maintained, this he failed to do. Thus, due to Comet’s negligence, the mud weight at the time or near the time of the blow-out remains an unknown factor.
If we assume for argument, the mud weight was 10 pounds per gallon going in, Comet is not absolved of contributory negligence. All the experts agree a well will blow out if the hole is not kept filled during a trip out. According to the testimony of Cody Griffith, the level in the mud tanks dropped at least eleven inches when the hole was being filled. With this drop-page, the experts all agree that the hole had taken an abnormally large quantity of mud. Had the crew observed the amount of mud the hole had taken, they should have been apprised of trouble. Safe drilling procedure would require them to close off the well long before the blow-out and attempt to locate the problem. This they omitted to do because they apparently did not keep track of the mud that had been pumped from the tanks.
Thus, while we have reservations as to whether an adequate mud program had been specified after the first kick, we conclude that the mud program, if inadequate, was only a contributing cause to the blowout. The negligence of the Comet crew in tripping out is apparent. Had safe drilling procedures been followed, it is possible the blow-out would have been prevented. At the very least, Comet’s negligence contributed to the occurrence and for this reason, its insurer, subrogated to Comet’s claim, is barred from recovery.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.

. The mud and chemical supplier and its insurer were also named defendants. Judgment was rendered in the lower court dismissing the suit against them and plaintiff now acquiesces in this result.